**DILKS v. UNITED STATES.**

No. 48042.

United States Court of Claims.
June 5, 1951.

Fred W. Shields, Washington, D. C., King & King, Washington, D. C., on the briefs, for plaintiff.

Paris T. Houston, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

Defendant has moved for leave to file a motion for a new trial out of time and motion for leave to file has been granted.

The motion for a new trial is urged on the ground that our decision in this case is inconsistent with our decision in the case of Moreno v. United States, 93 F.Supp. 607, 118 Ct.Cl. 30, and that a resolution of the alleged inconsistency would serve the interests of justice and expedite the conclusion of pending cases. That inconsistency, it is said, lies in the court's failure in the instant case to concede the proper finality to the determinations of the head of the department as to plaintiff's status at the time of capture and as to his entitlement to allowances, which determinations by the head of the department involved are made final and conclusive by section 9 of the Missing Persons Act, as amended, 56 Stat. 143, 58 Stat. 679, 50 U.S. C.A. Appendix, § 1009.

Insofar as applicable to the Dilks and Moreno cases, section 2 of the Missing Persons Act, 50 U.S.C.A. Appendix, § 1002, provides that any person in active service who is officially determined to be absent in a status of captured by an enemy (Dilks), or beleaguered or besieged (Moreno) shall, for the period he is officially determined to be in such status, be entitled to receive or have credited to his account the same pay and allowances to which he was entitled at the beginning of such period of absence or may become entitled to thereafter. Section 9 of the Act gives to the department concerned, the authority to make, among others, conclusive determinations as to the status of the absent person and of his entitlement to pay and allowances. Section 11 of the Act provides that the head of the department concerned or his designee, has the authority to " * * settle the accounts of persons for whose account payments have been made pursuant to the provisions of sections 2 to 7, both inclusive, of this Act, and the accounts of survivors of casualties to ships, stations and military installations which result in loss or destruction of disbursing records, and such settlements shall be conclusive upon the accounting officers of the Government in effecting settlements of the accounts of disbursing officers." 50 U.S. C.A. Appendix, § 1011.

In the Moreno case, the department concerned officially determined that Moreno was *not* absent in a status of beleaguered or besieged within the meaning of section 2 of the Act during a certain period of time, and that, accordingly, for that period of time he was not entitled to receive or have credited to his account the pay and allowances to which he was entitled at the beginning of his absence. In the Dilks case, the department concerned officially determined that Dilks *was* absent in the status of captured by the enemy (prisoner of war) and that he was entitled to receive the pay and allowances of which he was in receipt at the beginning of his absence in such status. In the Dilks case, the departmental determinations as to status and entitlement to pay and allowances generally were not challenged by plaintiff Dilks. Pursuant to section 11 of the Act, above-quoted in part, the Office of Special Settlement Accounts issued its Settlement of Pay Account for Dilks, which included certain credits and debits. On receipt of this Settlement, Dilks notified the Finance Office that at the time of his capture he was under competent orders, never revoked, directing the Finance Officer to pay him quarters and rations allowances. Dilks

then made claim to have these allowances credited to his account for the duration of his captivity. His claim was later disallowed on the ground that the payment of monetary allowances in lieu of rations and quarters during the time an officer or enlisted man was in a prisoner of war status was contrary to the established policy of the Office of Special Settlement Accounts, in the administration of the Missing Persons Act, 50 U.S.C.A. Appendix, § 1001 et seq. Dilks then brought his suit for such pay and allowances in this court, and the only question presented to the court was whether the monetary allowance in lieu of rations and quarters, of which Dilks was in receipt on the date of his capture, was the sort of allowance which Congress intended should be credited to the account of a prisoner of war during the period of his captivity. The Act does not specify the types of allowances which shall be so credited. It says that the man, determined to be in any one of the prescribed statuses, section 2, shall have credited to his account "the same pay and allowances to which he was entitled at the beginning of such period * * *." There is no dispute that Dilks was in a prisoner of war status and was as a matter of law, entitled to have credited to his account certain pay and allowances during the period of his entitlement. On the question, "What pay and allowances was he entitled to at the beginning of the period of captivity?" there is no dispute that he was, pursuant to competent orders, entitled to a monetary allowance in lieu of rations and quarters. In its attempt to limit the meaning of the phrase in section 2, "the same pay and allowances to which he was entitled at the beginning of such period," defendant cited to the court certain legislative history which it urged indicated that Congress was advised of, and agreed to, the policy of crediting such so-called continuing pay and allowances as flight pay, submarine pay, parachute pay, subsistence, rental or quarters allowances, and of not crediting temporary per diem or travel allowances. The question for decision by this court was whether or not the allowance for rations and quarters, of which Dilks

was in receipt on the date of his capture, was of the sort Congress understood would be credited to his account during captivity.

■ Inasmuch as the language of the Act, taken by itself, would include *any* allowance of which a captured person was validly in receipt, proof that Congress intended to exclude any one type of allowance would have to be specific. The type of allowance in question was not mentioned in the hearings or reports. This court determined that the allowance was not, at the time of Dilks' capture, travel pay. Since it was not one of the types of allowance specifically mentioned to Congress for exclusion, and since it was similar to certain allowances which Congress was told would be included, we held that Dilks must recover. In so holding, we did not disturb the departmental determinations relative (1) to Dilks' status as a prisoner of war, (2) to Dilks' entitlement to receive pay and allowances for the determined period of captivity, and (3) to the various allowances of which he was in receipt at the commencement of his captivity. We merely held as a matter of law that under the broad and inclusive language of section 2 of the Missing Persons Act, one type of allowance of which Dilks was admittedly in receipt under competent, unrevoked and existing orders at the time of his captivity could not be excluded from his account in the absence of proof of a specific congressional intent to so exclude it.

Section 9 of the Missing Persons Act was not called to the court's attention prior to the decision in this case, but it is our opinion that it has no application to the question presented to this court for decision. Section 9 represented a substantial amendment to the Act, enacted in 1944 as a result of certain inadequacies found to be inherent in the original legislation passed in 1942, 56 Stat. 143. Under the original Act, status (dead, missing in action, prisoner of war, etc.) and periods of entitlement were dependent on reports of actual happenings. The enemy frequently made no reports at all. Reports, when made, were slow in coming and often indicated that a person who had been carried in a missing status for a certain period, had in fact

been dead for several months of that period. In such cases the accounting officers of the Government determined that any payments made by way of allotments, or any allowances credited to the account of such person, during the period the missing person was dead, constituted overpayments which must be charged against any death benefits. Determinations as to exactly what pay and allowances a man was receiving at the time he disappeared, were frequently difficult to make because of the loss or inadequacy of pertinent records. To correct this condition, the original Act, section 2 reading: "Any person who is in active service and is officially reported as missing, missing in action * * *", was amended to provide that "Any person who is in active service and who is officially determined to be absent in a status of missing * * *." Section 9 was enacted in 1944 and provided that an official determination of a person's status and any essential dates pertaining thereto, should be conclusive. With respect to reopening an account which has been settled, section 9 provided that no account should be reopened because of a subsequent report or determination fixing a date of death except in a case where the date of death so fixed is *later* than the date used as a basis for prior settlement. The sixth provision of the new section 9 reads as follows: " * * Determinations are authorized to be made by the head of the department concerned, or by such subordinate as he may designate, of entitlement of any person, under the provisions of this Act to pay and allowances, including credits and charges in his account, and all such determinations shall be conclusive * * *."

With respect to this provision, House Report No. 1674, dated June 17, 1944, from the Committee on Naval Affairs, H. R. 4405, had the following to say: " * * * Many situations have arisen and more are anticipated in which some determinations, conclusive upon the accounting officers of the Government, must be made of the credits and debits to the account of missing persons. There are questions of rank, grade, classification of civilian employees, entitlements to allowances of various kinds, debits on account of allotments or family allowances, and the periods of various credits and debits. All of this can be best determined and should be determined by the head of the department concerned. The department should have authority, utilizing its knowledge of military and administrative conditions and circumstances, to determine whether a promotion has been made, whether entitled to rental allowance, whether monetary allowances for quarters is payable, the rate of pay of civilian employees, and many other questions arising through loss or inadequacy of individual records. This provision grants the needed authority to make all such determinations."

Normally, a man would not be credited with pay resulting from promotion to a higher grade, or with allowances of various sorts, unless there were in existence official documents evidencing his right to such pay and allowances, and the General Accounting Office would not approve the payment of such items unless properly authorized. The sixth provision of section 9 of the Missing Persons Act recognized that in many cases such official documents might be lost but that the department involved, through its knowledge of conditions and on the basis of which evidence it might have, could and should be allowed to make conclusive determinations that a man has been promoted to a certain rank was entitled to certain allowances, etc., in the absence of official documentary proof of such matters. In order that man might not lose by such a determination based on incomplete records, the ninth provision of section 9 provided: "When circumstances warrant reconsideration of any determination authorized to be made by this Act, the head of the department concerned, or such subordinate as he may designate, may change or modify a previous determination." In the Hearings before the Committee on Naval Affairs, Report No. 241, June 13, 1944, 78th Cong., 2d Sess., it was indicated clearly that the finality which section 9 provided should be accorded to determinations of the various departments, was for the purpose of precluding the possibility of later disallowance by the General Accounting Office of settlements

based on incomplete records. Hearings, pages 2324–2330, incl.

In the Dilks case, there appears to be no question of inadequate records. There exists no dispute as to the facts, and the determinations which the Act authorized the department to make and which it made are not challenged. The only issue is one of law as to what Congress intended when, in section 2, it used the expression "the same pay and allowances." We find nothing in the Missing Persons Act which makes a departmental conclusion on such an issue final so as to preclude judicial review. In denying plaintiff's claim, the department apparently relied on a decision of the Comptroller General, 23 Comp.Gen. 895, May 27, 1944. This decision itself was a legal interpretation of section 2 of the Missing Persons Act, before amendment in 1944, and is in no sense binding upon this court.

Under the facts and circumstances of this case we are of the opinion that defendant's motion for a new trial is not well-grounded, and it is accordingly overruled. It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.